**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

FRANK J. BRUNO,            )
                                  )
               Plaintiff,       )
                                  )
       v.                 )         Civil Action No. 10-404
                                  )         Judge Nora Barry Fischer
AT&T MOBILITY LLC,     )
                                  )
           Defendant.    )

## MEMORANDUM OPINION

### I.    INTRODUCTION

Plaintiff Frank J. Bruno ("Plaintiff") brought this action against Defendant AT&T Mobility LLC ("Defendant") to recover severance pay under the terms of Defendant's Severance Pay Plan. (*See* Docket No. 4). Presently pending before the Court is Defendant's Motion for Summary Judgment. (Docket No. 36). For the reasons outlined herein, that Motion is GRANTED.

### II.    FACTUAL BACKGROUND

Unless otherwise specified, the facts of record are uncontested. Viewed in the light most favorable to Plaintiff, they are as follows.

    *A.    Plaintiff's Employment and Termination*

Plaintiff was employed by Defendant or its predecessors from November 11, 1996 until his termination on July 7, 2008. (Docket Nos. 37-3 at 6, 12, 37-6). During his employment, Plaintiff initially began as an Audio Quality Engineer, but later became an RF Engineer I when his former position was eliminated companywide in 2004. (*Id.* at 6). This transition proved difficult for Plaintiff. (*See Id.* at 9). Indeed, as early as May 2005, and continuing through May 2008, Plaintiff acknowledges that performance-related issues were brought to his attention in the

form of annual performance reviews, as well as performance improvement plans and written warnings. (*See* Docket Nos. 37-3 at 12, 37-7, 37-8, 37-9, 37-10, 37-11, 37-12, 37-13). Additionally, as late as 2007, Plaintiff admits that his performance was below the standard set by the other RF Engineers in his group.[1]

In advance of his termination, Matthew Thomas, who was Plaintiff's direct supervisor, and Allison Menster, Defendant's Employee Relations Manager, exchanged a series of emails and voicemails relating to Plaintiff. (*See* Docket No. 37-5). The dialogue began when, on July 2, 2008, Ms. Menster received an automated message that Mr. Thomas had submitted a "terminate request" for Plaintiff that required her approval, (*Id.* at 7), and culminated five days later when, on July 7, 2008, Ms. Menster sent an email to Mr. Thomas, carbon copy to Scott Sorice[2] and Karen Mendolia,[3] with a subject line entitled "Frank Bruno termination," (*Id.* at 4).[4] In the latter email, Mr. Thomas was informed that he could "proceed with [the] termination meeting for [Plaintiff] … for his continued pattern of unacceptable job performance." (*Id.* at 4). The email also identified certain "key points" related to said meeting. (*Id.*). In particular, the email instructed Mr. Thomas to:

---

[1] According to Plaintiff, at that time, the other RF Engineers working alongside him were: Joe Spiecha, Dan Duetchendorf, Vicky Guscoff, Pat Horn, Shawn Dugan, and Joel Gaeser. (Docket No. 37-3 at 6).

[2] Scott Sorice is Defendant's RAN Director and was Plaintiff's indirect supervisor. (Docket No. 37-19 at 1).

[3] Karen Mendolia was Defendant's Employee Relations Manager prior to Ms. Menster. (Docket No. 37-4 at 7-8).

[4] Plaintiff argues that the series of emails between Ms. Menster and Mr. Thomas have not been properly authenticated. (Docket No. 42 at 2-3). "A party to litigation that produces documents during discovery in that litigation thereby authenticates the documents it has produced." *Rouse v. II-VI, Inc.*, Civ. No. 06-566, 2008 U.S. Dist. LEXIS 10076, at *2 (W.D. Pa. Feb. 11, 2008) (citing *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 928 (3d Cir. 1985)). Here, it is undisputed that the emails in question were produced by Defendant during discovery in this lawsuit. (*See* Docket No. 41 at 3). Moreover, these emails were authenticated by Mr. Thomas during his deposition. (*See* Docket No. 37-4 at 19). Thus, the Court overrules Plaintiff's objection and will consider the email chain between Ms. Menster and Mr. Thomas. *See* Fed. R. Civ. P. 56.

> Review with [Plaintiff] the key points mentioned in the [performance improvement plan] he received, your last meeting with him, and the fact that you have not seen improvements in the areas discussed.

> Advise [Plaintiff] that the company has made the decision to terminate his employment for continued pattern of unacceptable Job Performance.

> \* \* \* \* \*

> Provide [Plaintiff] with the numbers to payroll … and benefit … hotlines for any issues related to either.

> \* \* \* \* \*

> Submit the termination via Manager Self-Service. Terminate Date is day AFTER the termination meeting. Select "DIS – Performance" for reason code. Select "Not eligible for rehire."

(*Id.* at 4-5). The email did not indicate that Plaintiff's termination was based on or part of a reduction in Defendant's work force. (*See Id.*).

Subsequently, Plaintiff was called to Mr. Thomas' office for a meeting with Mr. Thomas, who had been joined by Mr. Sorice. (Docket No. 37-3 at 12). At this time, Plaintiff was told that his employment with Defendant had been terminated. (*Id.*). Plaintiff was then escorted to his desk to gather his belongings before he was eventually led out of the building by Mr. Thomas. (*Id.* at 12-13). During the course of these proceedings, no documents[5] were provided to Plaintiff and there was no discussion about any type of workforce reduction. (*Id.*). Likewise, Plaintiff was not asked to sign a waiver and release in exchange for severance benefits. (*Id.* at 14). At the time of his termination, Plaintiff was earning approximately $54,000 per year. (Docket No. 4 at 3).

Within Defendant's management structure, various levels of approval were needed in order to effectuate Plaintiff's termination. (*See* Docket No. 37-4 at 20). As identified in

---

[5] Notably, at his deposition, Plaintiff confirmed he did not receive a Surplus Notification Letter. (Docket No. 37-3 at 14); (*see also* Docket No. 37-2 at 4).

Defendant's "Termination Document" pertaining to Plaintiff, in addition to Mr. Thomas, Mr. Sorice, and Ms. Menster, Defendant's Regional Executive Director Chris Bondurant and attorney Bettina Wing-Che Yip were also involved in the decision to involuntarily terminate Plaintiff's employment on July 7, 2008.[6]  (*See* Docket Nos. 37-4 at 20, 37-6 at 4).  The Termination Document lists the reason for Plaintiff's termination as "Performance Improvement Plan," (Docket Nos. 37-4 at 20, 37-6 at 2), and describes various performance issues that were perceived during Plaintiff's employment for Defendant, (Docket No. 37-6 at 2-4).  It does not contain a reference to any type of force reduction process.  (*Id.*).  Indeed, to this end, Mr. Sorice states, regarding his involvement in the decision-making process, that Plaintiff's "termination was not the result of any type of workforce reduction" and that "[t]he sole reason that [Plaintiff] was terminated was due to his continued pattern of unacceptable job performance."[7]  (Docket No. 37-19 at 2).  Similarly, Mr. Thomas testified that, in the course of his employment as a manager in Defendant's RF Engineering department, he has never been involved in any type of reduction in force.  (Docket No. 37-4 at 20).

---

[6] Like the aforementioned email chain, Plaintiff also argues that the Termination Document has not been properly authenticated.  (Docket No. 42 at 3).  For the reasons cited previously, *see supra* n.4, this objection is similarly overruled and the Court will consider the Termination Document.  *See* Fed. R. Civ. P. 56.

[7] Plaintiff appears to suggest that the Court should disregard the Affidavit of Scott Sorice, which Defendant filed in support of the instant motion, based on the "sham affidavit" doctrine.  (*See* Docket No. 42 at 10-11).  As explained by the United States Court of Appeals for the Third Circuit, the "doctrine generally 'refers to the trial courts' practice of disregarding an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony.'"  *In re CitX Corp., Inc.*, 448 F.3d 672, 679 (3d Cir. 2006) (citing *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004)).  Plaintiff argues that the doctrine should be applied here even though the affidavit in question was submitted by the moving party and, therefore, clearly not submitted in an attempt to create an issue of fact—the primary safeguard of the "sham affidavit" doctrine.  *Atchison v. Sears*, 666 F. Supp. 2d 477, 492 n.7 (E.D. Pa. 2009).  In this regard, the Court notes initially that Federal Rule of Civil Procedure 56 permits the moving party to submit affidavits in support of a motion for summary judgment.  Fed. R. Civ. P. 56.  Further, Plaintiff has failed to satisfy his burden of providing the Court with the materials necessary to support his position.  *See* W.D. Pa. L. Cv. R. 56(C)(3) ("Documents referenced in the Responsive Concise Statement shall be included in an appendix.")  In fact, contrary to Plaintiff's assertion, Defendant avers that Mr. Sorice "was never deposed in connection with this case or, for that matter, [in] any case involving Plaintiff."  (Docket No. 44 at 5).  Plaintiff has filed no further response.  Accordingly, based on the parties' arguments and the documents of record, the Court will consider the statements made in Mr. Sorice's Affidavit.  *See* Fed. R. Civ. P. 56.

*B.*      *Severance Pay Plan*

The AT&T Inc. ("AT&T") Severance Pay Plan ("the Plan") "is an employee welfare benefit plan which provides for … the payment of Severance Allowances out of general assets of the Participating Company to eligible employees who are selected for involuntary termination as a direct result of force surplus, technological, operational, organizational and/or structural changes affecting the Company."   (Docket No. 37-2 at 4).   Defendant is a "Participating Company" under the Plan.  (*Id.* at 17).

According to its terms, the Plan was "established effective January 1, 1994, and revised July 1, 2007 and is applicable to any Eligible Employee who receives a written Surplus Notification Letter provided after that date."  (*Id.* at 4).  Eligibility for severance pay benefits under the Plan is governed by Article 1.3, which provides, in relevant part, as follows:

> An individual is an "Eligible Employee" and is eligible for benefits under this Plan, if the individual:
>
> A.      is a non-bargained employee of a Participating Company….  An individual is a non-bargained employee of a Participating Company if the individual is not employed in a position that is represented by a union, paid on the U.S. dollar payroll of a Participating Company, and receives a regular and stated compensation, other than a pension or retainer, from a Participating Company for services rendered,
>
> B.      is an active employee (including employees who are on a short-term disability or on leave of absence with guaranteed reinstatement),
>
> C.      is a regular full-time or part-time (one who works 20 hours or more per week) employee,
>
> D.      is selected for involuntary termination by the Participating Company as a direct result of force surplus, technological, operational, organizational and/or structural changes affecting the Company or a Participating Company or special eligibility for certain of such eligible employees to receive retiree life insurance and health benefits,

E.     has received a written Surplus Notification Letter ("SNL") in accordance with the Management Surplus Guidelines, and

F.     has properly executed a Participating Company-approved General Release and Waiver of all rights and claims relating to the employee's employment and termination, and delivered it to the designated Participating Company representative within a specified period from the date the employee initially received the General Release and Waiver from the Participating Company. The period the individual will have to review and consider the General Release and Waiver and the title/address of the designated Participating Company representative will be included in the terms of the document.

An individual is ***not*** an Eligible Employee and is ***not*** eligible for benefits under this Plan (even if such employee has received a SNL) if:

\* \* \* \* \*

I.     the employee is terminated because of performance related problems (however, an employee who is terminated pursuant to a formal company force reduction selection process in which performance is either one of the factors considered or the sole factor considered, nevertheless shall be an eligible employee for purposes of this Plan)….

(*Id.* at 4-5) (emphasis in original). Article 1.3 later provides that "[e]ligibility is determined as of the date of termination, with the exception of completion of the General Release and Waiver, which may occur after termination," (*Id.* at 5), and stipulates that, "[i]n all cases, in order to be eligible to participate in this Plan, the reason for the employee's termination from employment with the Company or Participating Company must be coded as severed pursuant to this Plan within the Participating Company's payroll and personnel records," (*Id.* at 6). Finally, "notwithstanding anything to the contrary," pursuant to Article 1.3, "the Plan Administrator shall have the final and binding discretion to determine eligibility in all cases."[8] (*Id.*).

---

[8] AT&T is identified as the Plan Administrator in Article 3.1 of the Plan. (Docket No. 37-2 at 11).

Article 2 of the Plan contains instructions on how to submit written claims under the Plan, as well as how to file an appeal for further review. (*Id.* at 9-11). For instance, according to Article 2.2, "[a]ny individual having a claim for benefits … under this Plan, or any person duly authorized by such an individual, may file a claim in writing…The written claim should be filed within ninety (90) days of the date of the … occurrence of … facts giving rise to the claim." (*Id.* at 9-10). Article 2.3 then provides that "[a]ny person whose claim is denied under [Article 2.2][9] may file an appeal for further review within sixty (60) days of denial by the Claim Administrator."[10] (*Id.* at 10). Thereafter, once the claims and appeals process described in Articles 2.2 and 2.3[11] have been exhausted, Article 2.5 indicates that a lawsuit may be filed under Federal law to recover any benefits a claimant believes he or she is entitled to under the Plan. (*Id.*). Notably, as stated in Article 2.5, "[t]he claim and appeal process is generally considered to

---

[9] Specifically, as stated in Article 2.2:

The claimant will receive, within ninety (90) days of the claim's receipt, unless special circumstances require an extension of the time for processing, in which case a decision shall be rendered as soon as possible, but no later than 120 days after receipt of the request, a written notice of any claim denied by the Claim Administrator, including the specific reason for the denial, references to pertinent Plan provisions (or other information) on which the denial is based, a description of any material or information necessary to perfect the claim and an explanation of why such material or information is necessary, and information as to the steps necessary to submit the claim for further review.

(Docket No. 37-2 at 10).

[10] The Plan's Claim Administrator is AT&T's "Director-Human Resources Operations." (Docket No. 37-2 at 9).

[11] Similar to Article 2.2, under Article 2.3:

The Plan Administrator will conduct a full and fair review of the claim within sixty (60) days of receipt [of the written appeal], unless special circumstances require an extension of the time for processing, in which case a decision shall be rendered as soon as possible, but no later than 120 days after receipt of the request, and will provide notice in writing as to the decision regarding the claim, setting forth the specific reason(s) if such claim has been denied in whole or in part, and specific references to pertinent Plan provisions (or other information) on which such decision is based.

(Docket No. 37-2 at 10).

be 'exhausted' either when [the claimant has] received a final denial of an appeal for benefits, or when the Plan Administrator has gone beyond the time limits specified [in Articles 2.2 and 2.3] without making a decision on [claimant's] claim." (*Id.* at 11).

C.    *Plaintiff's Claim for Severance Pay*

Plaintiff initiated a claim for severance pay under the Plan by letter dated August 27, 2008.[12] (Docket No. 37-14 at 2). In his claim, Plaintiff alleged that he was entitled to severance under the terms of the Plan because:

> [A]lthough [Defendant] claims "performance related problems", this was a factor, whole or in part, that was connected to a formal work force reduction. This formal work force reduction was documented to the employees by global e-mail distribution, and was verbally communicated to me by my supervisor as the reason, in part, for my termination. The fact that my position has not been backfilled to date, further justifies this claim.

(*Id.*). Conforming to the Plan's "Schedule of Severance Allowance," as an employee with eleven years of service, Plaintiff requested a payout of 55% of his 2008 salary, or approximately $29,700.[13] (*See* Docket Nos. 37-2 at 7, 37-14 at 2).

Although Plaintiff acknowledges that, on the day he was terminated, there was no indication that he was being fired in connection with a reduction in Defendant's work force, Plaintiff maintains that there were prior communications—both written and verbal—that referenced both a force reduction and the potential for his termination in connection with same. (*See* Docket No. 37-3 at 13, 56-57).

---

[12] Plaintiff's request for severance was received by an authorized agent of Defendant on September 2, 2008. (*See* Docket No. 37-14 at 6).

[13] As previously stated, at the time of his termination in 2008, Plaintiff was earning approximately $54,000 per year.

For example, on April 18, 2008, Plaintiff received an email, with a subject line entitled "Streamlining Operations," which was sent to all of Defendant's non-bargained employees.[14] (*See* Docket Nos. 37-3 at 14, 17, 37-4 at 12, 37-15 at 2). As stated in the email:

> This morning we announced workforce reductions that are part of the next step in streamlining our operations—particularly in non-customer-facing positions. This enables us to operate more efficiently as one AT&T after bringing together several companies in recent years.
>
> It's expected that approximately 1.5 percent of our 310,000 employees will be affected.
>
> * * * * *
>
> We will be following our customary procedures to notify affected employees.

(*Id.*). Both parties agree that Plaintiff's position at the time of his termination was "non-customer-facing." (Docket Nos. 42 at 14, 45 at 4). Nevertheless, according to Defendant's RAN Director, this announcement related to AT&T's efforts to streamline its operations and had no impact on the RF Engineering department, of which Plaintiff was an employee.[15] (Docket No. 37-19 at 2). Instead, Mr. Sorice states that "the workforce reduction targeted areas that were showing no growth or even a decline, such as the Company's traditional landline and long-

---

[14] In addition to the April 18, 2008 email, at his deposition, Plaintiff testified that there were "numerous" other emails sent by AT&T, which referred to a workforce reduction. (*See* Docket No. 37-3 at 15-17, 19). Plaintiff then testified that he requested said emails from Defendant as part of fact discovery, but they were not produced. (*Id.* at 19). On this issue, Defendant provided the Affidavit of Jeff Nahlik, Senior Technical Director for AT&T Services, Inc. (*See* Docket No. 37-16). According to Mr. Nahlik, AT&T deletes the email accounts of former employees no later than five weeks following their departure, pursuant to its "Mailbox Manager Process." (*See Id.* at 5). Therefore, given Plaintiff's termination date of July 8, 2008, his work email account and associated inbox would have been deleted by August 16, 2008, at the latest. (*Id.* at 6). Mr. Nahlik further stated that "the only emails that exist pertaining to [Plaintiff] are those that were saved by an employee … on his or her computer hard drive or elsewhere." (*Id.*). Plaintiff has not produced any additional emails and, therefore, the April 18, 2008 email is the only "global email" of record. (*See* Docket Nos. 37-3 at 19, 37-15). Nevertheless, because at the summary judgment stage all facts and reasonable inferences must be drawn in favor of the non-moving party, *see Doe v. County of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001) (holding that "a court must take the facts in the light most favorable to the nonmoving party … and draw all reasonable inferences in their favor"), for purposes of the instant motion, the Court will assume the existence of additional global emails, which were sent by AT&T and referenced a downsizing of its workforce.

[15] Mr. Sorice identifies AT&T as Defendant's "parent company" within his affidavit. (Docket No. 37-19 at 2).

distance divisions, as well as a few other functional areas that experienced some overlap as different companies and divisions merged together."[16] (*Id.* at 3). Plaintiff disputes this contention.[17] (*See* Docket No. 42 at 10-11). Specifically, relying on the deposition testimony of Mr. Thomas, Plaintiff contends that his termination was part of a reduction in force connected to AT&T's acquisition of Dobson Communications in 2008, whose former employees were then integrated into the company, including the engineering group where Plaintiff previously worked. (*See* Docket No. 37-4 at 18-19).

In addition, at his deposition, Plaintiff testified that he had several oral and email conversations with his supervisor, Mr. Thomas, regarding his performance, wherein the topic of force reductions was also discussed.[18] (*See* Docket No. 37-3 at 10-13, 16-17, 19). In this regard, Plaintiff stated "there was, definitely, discussion about the company's downsizing, and without question, there was conversation, specifically, about it relating to me as far as how I need to get my performance up because those are the people they are going to target first." (*Id.* at 11). Despite these conversations, however, Plaintiff admits that no concrete details about the downsizing were ever discussed with him and further admits that he never received any type of written document which indicated that he had been selected for a workforce reduction. (Docket Nos. 37-3 at 12, 14, 42 at 6).

As to Plaintiff's claim that his position had not been backfilled as of August 27, 2008, Defendant notes that Mr. Thomas testified that John Shelley applied, interviewed, and was

---

[16] To this point, Mr. Sorice reports that the RF Engineering department reporting to him has actually grown approximately 20% since Plaintiff was terminated. (Docket No. 37-19 at 3).

[17] *See supra* n.7.

[18] In this regard, Plaintiff testified that there were emails sent between Mr. Thomas and himself, wherein the topic of downsizing was discussed. (*See* Docket No. 37-3 at 19). These emails were also not produced in fact discovery. (*Id.*). Yet, for the reasons stated previously, the Court will appropriately assume the existence of emails between Plaintiff and his supervisor in deciding the instant motion. *See supra* n. 14.

selected to fill the RF Engineer I position left vacant after Plaintiff's termination. (Docket No. 37-4 at 19, 21-22). Plaintiff, however, quarrels with this conclusion. (Docket No. 42 at 7-8, 13). Rather, Plaintiff refers to a separate portion of Mr. Thomas's deposition transcript, wherein he recognizes that Mr. Shelley became an employee of AT&T—as did all of Dobson Communications' employees—as a result of AT&T acquiring Dobson Communications subsequent to Plaintiff's termination. (*See* Docket No. 37-4 at 19). Moreover, according to Mr. Thomas, Mr. Shelley reports out of Defendant's Youngstown, Ohio office, not the Pittsburgh office where Plaintiff worked at the time of his termination. (*Id.* at 22-23). Indeed, Plaintiff claims that, since July 2008, the number of employees working out of the Pittsburgh office has decreased from seven to four. (*Id.* at 18). Ultimately, it is undisputed that Mr. Shelley was hired as an RF Engineer I on October 20, 2008.[19] (Docket No. 37-17 at 2).

When Plaintiff received no response to his written claim for severance pay, he sent a follow-up letter dated January 16, 2009.[20] (Docket No. 37-14 at 3). As stated in the letter:

> A claim for severance for [Plaintiff] was forwarded to this address certified mail, and was received by your office on September 2, 2008. Please be advised that you have failed to act on a request for severance benefits within 120 days of the request as outlined in the severance pay plan summary plan description document, section 2.2. I am making a final request for you to provide a response **in writing by Friday, 1-30-2009** as to the eligibility of my severance claim, and please forward any current relevant documentation on the AT&T severance plan.

---

[19] In this regard, the Court notes that, on October 20, 2008, Dina Gaudaen sent an email to Mr. Thomas, which stated, in pertinent part:

> All approvals have been received for John Shelley's offer. Please move forward with extending him the offer. Please ensure he's aware that the position is hourly. *Also, if he accepts he will remain on Dobson payroll and benefits*.

(Docket No. 37-17 at 2-3) (emphasis added).

[20] Consistent with Article 2.2 of the Plan, both the letter dated August 27, 2008, as well as the letter dated January 16, 2009 were mailed to: Claim Administrator, AT&T Severance Pay Plan, 105 Auditorium Circle, Suite 1001, Rm 8-B-30, San Antonio, TX 78205. (*See* Docket Nos. 37-2 at 9-10, 37-14 at 2-3).

(*Id.*) (emphasis in original). Thereafter, having still received no response from the Claim Administrator, Plaintiff submitted an appeal to the Plan Administrator on February 19, 2009, pursuant to Article 2.3 of the Plan.[21] (*Id.* at 4). In his appeal, Plaintiff wrote:

> [Article] 2.3 of your severance policy states that a person who is denied benefits under [Article 2.2] may file an appeal within 60 days of the denial of the claim administrator. Since the claim administrator has refused to respond to several requests for benefits within the specified time, I am assuming the claim is in denied status, and am forwarding an appeal to you as per the appeals policy in the document. Again, I am also requesting current plan documentation in the event that the document procedures I have are not the most current available. As per the appeals policy, your office has 60 days to conduct a full and fair review of the claim, or 120 days, in the event of special circumstances that would require an extension of time to process.

(*Id.*). No decision on Plaintiff's claim was ever issued by either the Claim or Plan Administrator.[22] (Docket No. 37-3 at 18-19).

III. PROCEDURAL HISTORY

Plaintiff commenced the current action by filing a Complaint in the Court of Common Pleas of Allegheny County on December 21, 2009, at docket number GD-09-23670. (Docket Nos. 1-2, 4). A Notice of Removal to the Western District of Pennsylvania was filed on March 25, 2010. (Docket No. 1). Subsequently, Defendant filed its Answer with Affirmative Defenses on April 1, 2010. (Docket No. 5). Discovery in this matter closed on October 12, 2010. (Docket Nos. 32, 33). Defendant then filed a Motion for Summary Judgment, along with a supporting brief, on November 29, 2010. (Docket Nos. 36, 38). In turn, Plaintiff filed his

---

[21] Although incorrectly addressed to "Claim Administrator," as compared to "Plan Administrator," consistent with Article 2.3 of the Plan, the February 19, 2009 appeal letter was mailed to 175 East Houston Street, Room 3-A-40, San Antonio, TX 78205. (*See* Docket Nos. 37-2 at 9-10, 37-14 at 4).

[22] On this issue, Defendant proffered the Affidavit of Denise Crawford, HROneStop Manager, Severance, for AT&T Services, Inc. (*See* Docket No. 37-18). In her employment, Mrs. Crawford is responsible for managing the claims for severance benefits that are sent to the Claim Administrator. (*Id.* at 2). Notably, although she identifies the signatures on the certified mail receipts produced by Plaintiff as belonging to individuals who work in her company's mail room, Ms. Crawford reports that neither the Claim Administrator nor the Plan Administrator has any record of receiving Plaintiff's claim for severance and, therefore, no claim or appeal file relating to same was ever opened. (*Id.* at 3-4).

response to Defendant's motion on January 5, 2011, (Docket No. 41), to which Defendant filed its reply on January 12, 2011, (Docket No. 44). As the briefing has concluded, Defendant's motion is ripe for disposition.

## IV. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[23] Pursuant to Rule 56, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A motion for summary judgment will only be denied when there is a genuine issue of material fact, i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). The mere existence of some disputed facts is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). As to materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

In determining whether the dispute is genuine, the Court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility. Rather, the Court is only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy*, 413 F.3d at 363; *see also Simpson v. Kay Jewelers*, 142 F.3d 639, 643 n.3 (3d Cir. 1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir.

_____

[23] Rule 56 was amended effective December 1, 2010. The explanatory notes to the 2010 amendments explain that while the language in Rule 56 was changed from "issue" to "dispute," the "standard for granting summary judgment remains unchanged." Thus, the Court considers binding prior jurisprudence of the United States Supreme Court and the United States Court of Appeals for the Third Circuit in arriving at the standard to be employed in addressing the instant motion.

1994)).  In evaluating the evidence, the Court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor.  *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

## V.    ANALYSIS

In the present case, Plaintiff contends that Defendant violated the terms of the Plan when it failed to award him severance payments either at the time of his termination or in response to his written requests made thereafter.  (*See* Docket No. 4).

### A.    *Existence of an ERISA Plan*

Initially, the Court notes that this case was removed from the state court of common pleas pursuant to 28 U.S.C. § 1441(b), and rightfully so.  (*See* Docket No. 1).  Plaintiff's Complaint seeks to enforce a claim arising under the Employee Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*  (*See* Docket No. 4).  ERISA is a comprehensive federal statute enacted "in the interests of employees and their beneficiaries" to afford minimum standards to employee benefit plans, "assuring the equitable character of such plans and their financial soundness."  *Page v. Bancroft Neurohealth, Inc.*, 575 F. Supp. 2d 664, 670-71 (2008) (citing 29 U.S.C. § 1001(a)).  It provides for the uniform federal regulation of employee benefit plans and promotes administrative efficiency through the exclusive federal regulation of such plans.[24]  *Keystone Chapter, Associated Builders & Contractors, Inc. v. Foley*, 37 F.3d 945, 954 (3d Cir. 1994).  "ERISA subjects employee benefit plans to participation, funding, and vesting

---

[24] Section 514(a)—ERISA's preemption provision—promotes uniform regulation of employee benefit plans by stating that "the provisions of [ERISA] shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan…."  29 U.S.C. § 1144(a).  The phrase "relate to" has been construed very expansively.  *Linden v. Sap America, Inc.*, Civ. No. 03-3125, 2004 U.S. Dist. LEXIS 8598, at *7 (E.D. Pa. May 6, 2004).  "A state law relates to an ERISA plan 'if it has a connection with or reference to such a plan.'"  *Egelhoff v. Egelhoff*, 532 U.S. 141, 147 (quoting *Shaw*, 463 U.S. at 97).  Notably, state law breach of contract claims are preempted by ERISA.  *Linden*, 2004 U.S. Dist. LEXIS 8598, at *7 (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 43 (1987); *LaFata v. Raytheon Co.*, 223 F. Supp. 2d 668, 676 (E.D. Pa. 2002)).

requirements, and to uniform standards on matters like reporting, disclosure, and fiduciary responsibility." *Id.* (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90-91 (1983)).

Under ERISA, an "employee welfare benefit plan" is defined as:

> [A]ny plan, fund, or program … established or maintained by an employer … for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, … medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death, or unemployment….

29 U.S.C. § 1002(1). This definition includes plans that provide employees with severance benefits upon the termination of employment. *See Id.*; *Massachusetts v. Morash*, 490 U.S. 107, 116 (1989). Specifically, severance benefits implicate ERISA if they require the establishment of an ongoing and separate administrative scheme to provide benefits. *Linden*, 2004 U.S. Dist. LEXIS 8598, at *8 (citing *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11-12 (1987); *Fetterolf v. Harcourt Gen., Inc.*, Civ. No. 2001 U.S. Dist. LEXIS 21006, at * (E.D. Pa. Dec. 18, 2001)).

Here, the Plan contains a "set of standard procedures to guide processing of claims and disbursement of benefits." *Fort Halifax*, 482 U.S. at 9. The Plan enumerates a formula for the calculation of benefits. (*See* Docket No. 37-2 at 7); *see Linden*, 2004 U.S. Dist. LEXIS 8598, at *8. The Plan also describes the conditions under which employees are eligible for severance benefits, provides different arrangements for the distribution of such benefits, and contains a detailed claims procedure. (*See* Docket No. 37-2 at 4-11); *see Linden*, 2004 U.S. Dist. LEXIS 8598, at *8-9. Lastly, the Plan document itself states that it "constitutes the Plan Text and the Summary Plan Description" and "shall be governed and interpreted in accordance with ERISA." (Docket No. 37-2 at 4, 12); *see Gursky v. Gen. Elec. Gov't Servs.*, Civ. No. 90-3016, 1990 U.S. Dist. LEXIS 8798, at *6-7 (E.D. Pa. July 12, 1990) (finding that an employer's layoff benefits

plan was an ERISA plan because it required administrative guidance and the plan stated that it was subject to ERISA). As the Plan is an ERISA plan, Plaintiff's claim for severance benefits brought under § 502(a)(1)(B) of ERISA, which has been codified at 29 U.S.C. § 1132(a)(1)(B),[25] will be construed as such.

B.      ERISA Standard of Review

Having determined that ERISA applies to this action, the Court's first task in evaluating Plaintiff's claim is to determine the applicable standard of review under ERISA. *Baker v. Hartford Life Ins. Co.*, Civ. No. 08-6382, 2010 U.S. Dist. LEXIS 52724, at *24 (D.N.J. May 28, 2010). As recognized by the United States Court of Appeals for the Third Circuit, ERISA itself does not establish the standard of review for an action brought under 29 U.S.C. § 1132(a)(1)(B). *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 437 (3d Cir. 1997). In *Firestone Tire & Rubber Co. v. Bruch*, the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. 101, 115 (1989). If, on the other hand, the plan does provide the administrator with discretionary authority, the standard of review is more deferential and the court applies an abuse of discretion standard.[26] *See Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 792 (3d Cir. 2010) (citing *Firestone*, 489 U.S. at 115). This deferential standard applies not only

<hr/>

[25] Section 502(a)(1)(B) states in relevant part:

A civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

29 U.S.C. § 1132(a)(1)(B).

[26] In reviewing ERISA cases involving denial of benefits by the plan administrator, the Third Circuit uses the phrase "arbitrary and capricious" interchangeably with "abuse of discretion." *Brown v. First Reliance Standard Life Ins. Co.*, Civ. No. 10-486, 2010 U.S. Dist. LEXIS 142123, at *16 n.5 (W.D. Pa. Mar. 18, 2011) (citing *Howley*, 625 F.3d at 793; *Estate of Schwing v. Lilly Health Plan*, 562 F.3d 522, 526 n.2 (3d Cir. 2009)).

to decisions concerning interpretation of the plan itself, but also to the administrator's fact-based determinations. *See Luby v. Teamsters Health, Welfare, & Pension Trust Funds*, 944 F.2d 1176, 1187 (3d Cir. 1991). Significantly, however, "[t]he deferential standard of review of a plan interpretation 'is appropriate only when the trust instrument allows the trustee to interpret the instrument *and when the trustee has in fact interpreted the instrument*.'" *Gritzer v. CBS, Inc.*, 275 F.3d 291, 296 (3d Cir. 2002) (quoting *Moench v. Robertson*, 62 F.3d 553, 567 (3d Cir. 1995) (emphasis in quotation)).

After reviewing the undisputed facts and interpreting all inferences in favor of Plaintiff, it is clear that a *de novo* standard should be applied. Although the Plan states that "the Plan Administrator shall have the final and binding discretion to determine eligibility in all cases," (Docket No. 37-2 at 6), the record is clear that the Plan Administrator did not actually exercise any grant of discretion in this case. (*See* Docket No. 37-3 at 18-19); s*ee also Gritzer*, 275 F.3d at 296 (citing *Moench*, 62 F.3d at 568 (holding that a *de novo* standard is appropriate when the decision-maker did not actually exercise its discretion)). Thus, a *de novo* review is required.

### C.    *Benefit Eligibility*

Within this standard, Defendant argues that it is entitled to summary judgment as to Plaintiff's claim for severance pay because Plaintiff fails to satisfy the requirements necessary to be considered an Eligible Employee under the Plan. (Docket No. 38).

In conducting a *de novo* review, the Court is "'bound by the provisions of the documents establishing an employee benefit plan without deferring to either party's interpretation.'" *Martin v. Masco Indus. Employees' Benefit Plan*, 747 F. Supp. 1150, 1153 (W.D. Pa. 1990) (quoting *Brown v. Ampco-Pittsburgh Corp.*, 876 F.2d 546, 550 (6th Cir. 1989)); *see also Luby*, 944 F.2d at 1180 ("Drawing from trust law principles, the Court in *Firestone*

noted that the terms of the plan are construed without deferring to either party's interpretation.") (citing *Firestone*, 489 U.S. at 112). "In other words, the instant dispute is to be approached just as any other question of contract interpretation—this [C]ourt seeks to enforce the parties' intent." *Martin*, 747 F. Supp. at 1153. To that end, "[a] principle of contract interpretation is that the best evidence of the intent of the parties is the plain language in the written agreement." *Kriner v. GTE Products Corp.*, Civ. No. 89-907, 1990 U.S. Dist. LEXIS 18557, at *9-10 (M.D. Pa. July 10, 1990) (citing *Brokers Title Co. v. St. Paul Fire & Marine Ins. Co.*, 610 F.2d 1174, 1181 (3d Cir. 1979)). Therefore, the task before this Court is to determine whether the terms at issue are ambiguous, and if they are not, to give effect to their meaning. *Martin*, 747 F. Supp. at 1153 (citing *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 101 (3d Cir. 1986); *Burnham v. Guardian Life Ins. Co.*, 873 F.2d 486, 489 (1st Cir. 1989) (stating that "straightforward language in an ERISA-regulated [plan] should be given its natural meaning")).

Whether terms in an ERISA plan are ambiguous is a question of law. *Bill Gray Enters. v. Gourley*, 248 F.3d 206, 218 (3d Cir. 2001). A term is "ambiguous if it is subject to reasonable alternative interpretations." *Taylor v. Cont'l Group Change in Control Severance Pay Plan*, 933 F.2d 1227, 1232 (3d Cir. 1991); *Mellon Bank, N.A. v. Aetna Bus. Credit Inc.*, 619 F.2d 1001, 1011 (3d Cir. 1980). To make this determination, the Court must first look to the plain language of the plan document. *In re UNISYS Corp. Retiree Med. Benefit "ERISA" Litig.*, 58 F.3d 896, 902 (3d Cir. 1995) ("The written terms of the plan documents control…."). If that language is clear, the Court must not look to other evidence. *In re Unisys Corp. Long-Term Disability Plan ERISA Litig.*, 97 F.3d 710, 715 (3d Cir. 1996) (quoting *Mellon Bank*, 619 F.2d at 1013 ("Our approach does not authorize a trial judge to demote the written word to a reduced status in contract interpretation. Although extrinsic evidence may be considered under proper

circumstances, the parties remain bound by the appropriate objective definition of the words they use to express their intent….")).   Alternatively, the Court may look to extrinsic evidence to resolve any ambiguities if the plain language leads to two reasonable interpretations.  *Gourley*, 248 F.3d at 218.   However, "it is inappropriate to consider such [extrinsic] evidence when no ambiguity exists."  *Epright v. Envtl. Res. Mgmt.*, 81 F.3d 335, 339 (3d Cir. 1996).

At the outset, the Court notes that the crux of the parties' disagreement centers on Article 1.3 of the Plan.  This Court finds no ambiguity in said provision.  To this end, the Court notes that the Plan states that an employee "is an 'Eligible Employee' and is eligible for benefits under [the] Plan" if the employee "is a non-bargained employee…, is an active employee…, is a regular full-time or part-time … employee…, is selected for involuntary termination … as a direct result of force surplus, technological, operational, organizational and/or structural changes…, has received a written Surplus Notification Letter…, *and* has properly executed a … General Release and Waiver of all rights and claims relating to the employee's employment and termination…."   (Docket No. 37-2 at 4-5) (emphasis added).   The Plan then narrows the eligibility criteria through a sequence of subsequent provisions that apply even to an employee who has received a Surplus Notification Letter.  (*Id.* at 5).  As such, the Plan states that such an employee is not an Eligible Employee if:

> [T]he employee is terminated because of performance related problems (however, an employee who is terminated pursuant to a formal company force reduction selection process in which performance is either one of the factors considered or the sole factor considered, nevertheless shall be an eligible employee for purposes of this Plan)….

(*Id.* at 5).  In this Court's estimation, the term "Eligible Employee" is not ambiguous because the requisite conditions that give rise to this status are clearly defined by the Plan.  (*See Id.* at 4-6).

This being the case, the Court now turns its analysis to give effect to its meaning. *Martin*, 747 F.

Supp. at 1153 (citing *Pitterich*, 805 F.2d at 101; *Burnham*, 873 F.2d at 489).

In this case, it is manifest that Plaintiff has not demonstrated that he qualifies as an

Eligible Employee under the plain language of the Plan. Under ERISA, an employer is not

required "to provide severance benefits or any other substantive entitlement to employer-

provided welfare benefits," *Linden*, 2004 U.S. Dist. LEXIS 8598, at *11 (citing *Inter-Modal Rail*

*Employees Ass'n v. Atchison, Topeka & Santa Fe Ry.*, 520 U.S. 510, 515 (1997); *Curtiss-Wright*

*Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995)), and "may require employees to sign releases in

exchange for severance benefits," *Blood v. Eastman Kodak Co.*, Civ. Nos. 08-6123, 09-129,

2009 U.S. Dist. LEXIS 70223, at *26 (D.N.J. Aug. 10, 2009) (citing *Lockheed Corp. v. Spink*,

517 U.S. 882, 894-95 (1996); *Linden*, 2004 U.S. Dist. LEXIS 8598, at *11). As reflected in

Plaintiff's testimony, Plaintiff readily admits that he neither received a Surplus Notification

Letter nor executed a General Release and Waiver of all rights and claims relating to his

employment and termination. (*See* Docket Nos. 37-2 at 5, 37-3 at 14). Likewise, although the

Plan allows for the completion of the General Release and Waiver after termination, the record

contains no evidence that Plaintiff ever sought and secured such a release at any time. (*See*

Docket No. 37-2 at 5). These facts alone preclude Plaintiff's recovery of "unpaid severance

pay." (*See* Docket No. 4). Yet, there is more.

Indeed, as previously stated, Article 1.3 of the Plan stipulates that, "[i]n *all* cases, in order

to be eligible to participate in this Plan, the reason for the employee's termination from

employment with the … Participating Company must be coded as severed pursuant to this Plan

within the Participating Company's payroll and personnel records." (*Id.* at 6) (emphasis added).

Here, by contrast, Plaintiff's termination was "coded" by Defendant as "DIS − Performance."

(Docket No. 37-5 at 5). Thus, this Court concludes that—regardless of whether Plaintiff's termination was or was not in whole or in part the result of any type of workforce reduction— Plaintiff has not satisfied at least three of the requirements necessary to be considered an Eligible Employee under the plain language of the Plan. Consequently, under these circumstances, the Court is constrained to hold, based on the evidence before it, that Plaintiff is entitled to severance payments from Defendant.

VI.     CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgment, (Docket No. 36), is GRANTED. Summary Judgment is entered in favor of Defendant and Plaintiff's claims are dismissed, with prejudice. An appropriate Order follows.

<u>*s/ Nora Barry Fischer*</u>
Nora Barry Fischer
United States District Judge

Date:   May 6, 2011

cc/ecf: All counsel of record.